UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERREE MORROW,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

Case No. 13-11913
Hon. Laurie J. Michelson
Mag. Judge Michael J. Hluchaniuk

**OPINION AND ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

In 1998, a sciatic nerve condition left Plaintiff Sherree Morrow in bed for six weeks, during which time her employer terminated her employment. (*Id.*) Morrow also has a long history of severe migraine headaches that continue to this day. In 2009, Morrow, believing that her back condition and headaches prevent her from engaging in full-time work, applied for disability insurance benefits and supplemental security income under the Social Security Act. Morrow claimed that she had been disabled since 1998. An administrative law judge, acting on behalf of Defendant Commissioner of Social Security, disagreed. Morrow appeals that decision here.

Each party has moved for summary judgment, Morrow seeking a reversal of the Commissioner's disability determination or a remand to the Administration for further adjudication, the Commissioner asking the Court to affirm her decision. (*See* Dkts. 8, 11.) The Court has reviewed the administrative record, the ALJ's decision, and the parties' briefs. Under the governing deferential standard of review, the Court finds that Morrow has not shown that the

administrative law judge's credibility assessment was error or that he improperly used vocational expert testimony at step four. Accordingly, the Court DENIES Plaintiff's Motion for Summary Judgment (Dkt. 8), GRANTS Defendant's Motion for Summary Judgment (Dkt. 11), and AFFIRMS the Commissioner's disability determination pursuant to 42 U.S.C. § 405(g).

## I. BACKGROUND

### A. Medical Records

Although Morrow has alleged disability beginning in January 1998, the administrative record does not say much about her condition before 2006. An emergency-room record from 2000 indicates that Morrow sought treatment for her "wors[t] headache . . . ever . . . ." (Tr. 229.) The pain was in the frontal occipital region, and included pounding, photophobia, and multiple episodes of vomiting. (Tr. 229.) A brain CT-scan was normal. (Tr. 230.) Emergency-room notes indicate that Morrow's medical history included migraines, epilepsy, and chronic thoracic back pain. (Tr. 229.) At the time of her emergency-room visit, Morrow was taking Dilantain, an anti-seizure medication, Norflex, a pain reliever for muscular-type injuries, and Imitrex, a migraine medication. (Tr. 230.)

In February 2006, Morrow, apparently still suffering from migraines, underwent a CT-scan of her head. It revealed mild sinusitis, but was otherwise normal. (Tr. 308.)

The next month, Morrow saw Dr. Henry Hagenstein. (Tr. 316-18.) Morrow reported that her headaches had started "in childhood[,] years ago" and that her mother suffered from migraines and her sister from cluster headaches. (Tr. 317.) Morrow stated that her headaches were triggered by hunger, stress, and strong odors. (Tr. 316.) They occurred several times per week, and usually lasted several days. (Tr. 316.) She explained to Dr. Hagenstein that the pain was primarily in her right temporal region and behind her right eye and would peak at an "11" on

a scale where "10" meant unbearable pain. (Tr. 316.) Morrow reported that nausea, vomiting, photophobia, and dizziness accompanied her headaches. (*Id.*) Triptan agents like Imitrex improved her headaches, but various medications (beta blockers, anti-convulsants, and calcium channel blockers) had been intolerable or ineffective at preventing her headaches. (*Id.*) Dr. Hagenstein assessed: "Migraine headache without aura; I suspect that she has analgesic rebound headaches, probably from excessive Imitrex use." (Tr. 318.) He wanted Morrow to stop smoking, as that was a "major contributor to the refractory nature of her headaches," and to reduce the use of analgesics. (Tr. 318.) He thought that Topamax, Depakote, and a tricyclic antidepressant (e.g., Elavil) could work as preventative agents. (*Id.*)

In May 2006, Morrow apparently lost consciousness and therefore underwent a head CT-scan. (*See* Tr. 307.) The scan showed no evidence of infarct, hemorrhage, or mass effect. (*Id.*)

In October 2006, Morrow had a visit with her long-time physician, Dr. Brian Beck. (Tr. 271.) It appears (much of Dr. Beck's notes are illegible) that Morrow explained that she was having rebound headaches, and that Dr. Beck prescribed Elavil, Depakote, and (perhaps) Tramadol. (Tr. 271.) At the end of October, Dr. Beck provided Morrow with a Toradol injection. (Tr. 270.) Toradol is a short-term pain reliever which is first provided via injection and then continued for five days orally. Medline Plus, Ketorolac, http://goo.gl/Z5kK9W (last visited May 1, 2014).

In November 2006, Morrow reported that her headaches had decreased. (Tr. 269.) Indeed, Dr. Beck noted, "Better!!" and "Best in Years!" (*Id.*)

Nonetheless, Morrow's headaches continued for the remainder of the disability period at issue in this case. In January, February, and March 2007, Dr. Beck, or someone in his office, provided Morrow with Toradol injections. (Tr. 264, 267.) In June 2007, it appears (insofar as Dr.

Beck's short-hand can be deciphered) that Dr. Beck noted that Morrow was having headaches every 12 to 14 days which either then increased in frequency or had increased in frequency. (Tr. 263.) They lasted 24 to 26 hours with vomiting. (Tr. 263.) In September and October 2007, Dr. Beck provided Morrow with osteopathic manipulative treatment on her cervical spine. (Tr. 262.) In November 2007, Morrow's chief complaint was a sinus infection and headache. (Tr. 261.)

Dr. Beck's treatment notes from 2008 and 2009 are terse and hard to read. It appears that in June 2008, Dr. Beck noted that Morrow's headaches increased with stress. (Tr. 259.) In July and August 2008, Dr. Beck prescribed Imitrex or Treximet, another migraine medication. (Tr. 257.) In January 2009, Morrow was due for physical therapy (perhaps the osteopathic manipulative treatment) and a shot, but, because of a severe migraine headache, "she wanted only a shot." (Tr. 289.) In April and May 2009, Dr. Beck provided Toradol treatment. (Tr. 288-89.) In September 2009, Morrow called Dr. Beck's office with a complaint of sciatic nerve pain and to report that she had run out of Imitrex (or Treximet). (Tr. 252.) Later that month, Dr. Beck provided another Toradol injection. (Tr. 252.) Dr. Beck also continued to provide Morrow with osteopathic manipulative treatment. (Tr. 254, 256, 257, 259, 260.)

Morrow continued to see Dr. Beck for headaches in 2010. But in January, her primary complaint was lower back pain that radiated down her whole right leg and her left leg to her knee. (Tr. 251.) A lumbar-spine x-ray revealed moderate disc space narrowing at the L4-L5 and L5-S1 vertebrae and moderate facet arthropathy. (Tr. 291.) In February 2010, Morrow reported to Dr. Beck that she had been having a headache for three days, and, apparently, that her leg was keeping her from sleeping. (Tr. 250.) Later that month, Dr. Beck's plan included physical therapy, an MRI, "surgeon" or "surgery," and Vicodin. (Tr. 249.)

In March 2010, Dr. Samiullah Sayyid evaluated Morrow for Michigan's Disability Determination Service ("DDS"), a state agency that helps the Social Security Administration evaluate claimants in Michigan. (Tr. 321.) Morrow's chief complaint was "back ache" and migraines. (Tr. 321.) Morrow stated that her back pain radiated into her right leg, nearly to her foot, with some paresthesia and weakness. (*Id.*) She reported having migraines with nausea, occasional vomiting, and photophobia about three to four times per month, each lasting 24 to 36 hours. (Tr. 321.) Morrow told Dr. Sayyid that her migraines began in childhood. (*Id.*) Upon exam, Dr. Sayyid noted that Morrow's "lumbosacral spine was tender with diminished movements." (Tr. 322.) Morrow was able to walk normally and "walk on [her] heels and toes, squat and recover, and get on and off the [exam] table without difficulty." (*Id.*) Dr. Sayyid's impression: "Chronic back ache with right lower extremity sciatica, rule out disc problems. Migraine headaches." (*Id.*)

Morrow next saw Dr. Beck in April 2010. He wrote, "migraine – chronic" and something else illegible. (Tr. 248.)

In June 2010, Morrow underwent a second DDS consultative exam; this one was related to possible emphysema and was performed by Dr. Richard Gause. (Tr. 312-15.) Dr. Gause noted that Morrow was "unsure whether or not she ha[d] a problem with her breathing" and that Morrow had been "told by a physician, in passing, that she had emphysema." (Tr. 312.) Dr. Gause wrote: "She feels she can walk 12-15 blocks on a flat surface and can climb two flights of stairs, without having to stop." (Tr. 312.) After performing an examination and pulmonary function study, Dr. Gause concluded that Morrow had "essentially no exertional dyspnea" and that her "pulmonary exam was normal." (Tr. 314.)

The administrative record contains a "Report of Surgical Procedure" form from June 2010. (Tr. 246.) The form is sparsely noted and Dr. Beck's handwriting is again illegible. (*Id.*)

In late June 2010, Dr. U. Gupta reviewed Morrow's medical file and opined on her residual functional capacity for the DDS. (Tr. 53-54.) He thought that Morrow could lift 20 pounds occasionally, 10 pounds frequently, stand or walk for about six hours in an eight-hour day, and sit for about six hours in an eight-hour day. (Tr. 53.) He included some postural limitations, such as only "occasional[]" climbing of ladders, ropes, or scaffolds. (*Id.*)

According to a form that Morrow completed in connection with her disability application, in September 2010, she was taking Dilantin for her epilepsy, Flexeril for her pain, and Treximet for her migraines. (Tr. 211.)

The administrative record ends in November 2010. (Tr. 243, 335.) In early November, Dr. Beck provided Morrow with osteopathic manipulative treatment and noted "C-D pain" (perhaps cervical-disc pain) and "migraine." (Tr. 234.) A treatment note from mid-November states, "wants a migraine shot"; Dr. Beck provided a Toradol injection. (Tr. 243.)

**B. Hearing Before the ALJ**

In June 2011, Morrow, then 56 years old, appeared before Social Security Administrative Law Judge Troy M. Patterson to testify about her back pain and migraines. Morrow explained, "I woke up one morning [in 1998] and I couldn't move. I just couldn't move, and I'd never been quite that bad before." (Tr. 40.) She went to the hospital and learned that she had a problem with her sciatic nerve. (*Id.*) Morrow said she was bed-ridden for about six weeks, and, because her employer needed to find someone who could work, she was let go. (*Id.*) Morrow stated that her back pain was always present "to a degree," but that she was able to "cope with it on most days." (Tr. 41.) "[B]ut," said Morrow, "there are times where it's so severe that I cannot get out of bed

again, without help at least." (*Id.*) Morrow thought that her pain had worsened over time, but that even during the late 1990's and early 2000's, i.e., the period around her alleged disability onset date, her pain disrupted her sleep. (Tr. 41.) Morrow also indicated that in the late 1990's and the early 2000's she would have 10 bad days per month where she would have to lie down most of the day. (Tr. 42.)

Regarding her migraines, Morrow testified, "it seems like as I get older the headaches get worse, and actually become more frequent." (Tr. 43.) She stated that in the years following her alleged disability onset date, she was having "[p]robably at least three to four, up to half a dozen" migraines per month. (Tr. 43.) Morrow described her headaches this way: "I just pretty much stayed in bed. A lot of—they're terrible. There's a lot of crying going on. I just, I feel absolutely terrible. It's hard to explain to someone who's never had one that, you know, you ever got to the point where you just wish you weren't alive even. And there is no medication that will actually take care of it." (Tr. 43-44.) She explained that taking Tylenol was "like just eating candy" and that only Imitrex or Treximet worked but she could not afford them. (Tr. 44.) Morrow stated that her migraines would last from 24 to 36 hours, and even after that she would suffer "after effects" where she would still feel "terrible" and "very fatigued" to the point where she could "barely move." (Tr. 44.)

### C. The Disability Framework and the ALJ's Decision

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Patterson applied this five-step disability analysis and concluded that Morrow was not under a disability as that term is used in the Act. In particular, at step one, he concluded that Morrow had not engaged in substantial gainful activity since her alleged disability onset date of January 24, 1998. (Tr. 21.) At step two, the ALJ found that Morrow suffered from the following severe impairments: "back pain (degenerative disc disease) and migraine headaches." (Tr. 22.) At step three, the ALJ concluded that Morrow's impairments, alone or in combination, did not

meet or medically equal any of the Administration's listed impairments for presumptive disability. (Tr. 22.) Next, the ALJ determined that Morrow had the residual functional capacity to "perform the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)." (Tr. 22.)[1] At step four, relying on vocational expert testimony, the ALJ concluded that Morrow was capable of performing her past relevant work as a file clerk. (Tr. 25.) The ALJ thus determined that Morrow was not under a disability between her alleged onset date of January 24, 1998, and the date of his decision, September 28, 2011. (Tr. 26.)

The Social Security Administration's Appeals Council denied Morrow's request to review the ALJ's decision. (Tr. 1.) Thus, the ALJ's decision became the final decision of the Commissioner. Morrow asks this Court to find that decision erroneous.

## II. ANALYSIS

This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). But judicial review is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b). Social Security Ruling 83-10 further defines "a good deal of walking or standing" as "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

9

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

Morrow raises two claims of error but the Commissioner says that the Court need only address one. In particular, the Commissioner says that Morrow's argument that the ALJ erred in assessing her credibility has been waived. (Def.'s Mot. Summ. J. at 8-10.) The Commissioner points out that while Morrow's counsel recites the testimony that the ALJ allegedly should have credited, her counsel does not say *why* the ALJ should have credited that testimony. (Def.'s Mot. Summ. J. at 9-10.) The Commissioner stresses that this is not the first time that the law firm Morrow has retained has submitted social-security appeal briefs with arguments that are too cursory to warrant a court's attention. (Def.'s Mot. at 8 & n.4 (citing *Burger v. Comm'r of Soc. Sec.*, No. 12-11763, 2013 WL 2285375 (E.D. Mich. May 23, 2013); *Bush v. Astrue*, No. 12-11790, 2013 WL 1747807 (E.D. Mich. Jan. 25, 2013), *report and recommendation adopted by* 2013 WL 1747828 (E.D. Mich. Apr. 23, 2013); *Dice v. Comm'r of Soc. Sec.*, No. 12-11784, 2013 WL 2155528 (E.D. Mich. Apr. 19, 2013); *Deguise v. Comm'r of Soc. Sec.*, No. 12-10590, 2013 WL 1189967 (E.D. Mich. Feb. 19, 2013), *report and recommendation adopted by* 2013 WL 1187291 (E.D. Mich. Mar. 22, 2013); *Jackson v. Comm'r of Soc. Sec.*, No. 11-14672, 2013 WL 1148417 (E.D. Mich. Feb. 19, 2013), *report and recommendation adopted by* 2013 WL 1148416 (E.D. Mich. Mar. 19, 2013)).)

The Court agrees with the Commissioner that the credibility argument presented by Morrow's counsel is not well developed. Morrow's brief recites her testimony. (Pl.'s Mot.

Summ. J. at 9-10.) It then asserts: "Due to the fact that Ms. Morrow has had numerous severe impairments, it seems unlikely, and rather flawed, to find, as the ALJ did, despite not presenting a hypothetical, that she would be capable [of] returning to her past relevant work." (*Id.* at 10.) The brief goes on to claim that Morrow's migraines would require her to miss too many days from work and that she could not otherwise perform the physical requirements of light work. (*Id.*) The problem with this line of reasoning is that it starts from a premise that Morrow's counsel does not even attempt to establish. True, if Morrow's testimony was fully credited, it is likely that her back pain and migraines would preclude her from performing her past relevant work (or any substantial gainful employment). But the ALJ did not find Morrow fully credible, and Morrow's counsel does not say why that was error.

Although the Court declines to find Morrow's credibility argument waived, ultimately, her counsel's failure to argue why the ALJ's credibility determination lacks substantial evidentiary support is fatal to this claim of error. The Court notes that reviewing the administrative record has led to some concern about the ALJ's treatment of Morrow's testimony about her migraines. Morrow testified to having migraines three or four times per month, with episodes lasting between 24 and 36 hours. (Tr. 43-44.) The episodes were described as largely incapacitating. (*See id.*) This testimony has some support in the record. From January 2007 to November 2010, Dr. Beck provided Morrow with Toradol injections on at least eight occasions and also frequently prescribed Imitrex or Treximet for Morrow's migraines. Yet the ALJ's only explicit mention of Morrow's migraines in his credibility assessment was that Morrow "might be able to decrease the frequency of her migraines if she stopped smoking and reduced her medication intake." (Tr. 24.) Still, Morrow's counsel has not made the argument that Morrow's testimony about her migraines is corroborated by Dr. Beck's treatment notes. Indeed, Morrow's

11

brief does not mention Dr. Beck at all and it is difficult to know, based on Morrow's brief, whether counsel even reviewed his treatment notes.

Further, this Court generally owes credibility determinations by an ALJ "great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Here, the ALJ gave at least two reasons supported by substantial evidence for not fully crediting Morrow's testimony. First, the ALJ correctly noted that in a function report that Morrow completed in connection with her disability application, Morrow provided that she could walk "a few feet to a couple yards" before needing to rest; yet, at her consultative exam with Dr. Gause, Morrow thought she could walk 12 to 15 blocks and climb two flights of stairs without having to stop. (Tr. 24; *compare* Tr. 202, *with* Tr. 312.) Notably, Morrow completed the function report only four months before Dr. Gause's exam. (*See* Tr. 204, 312.)

Second, the ALJ concluded, "[w]hile the claimant testified she had not worked since 1998, medical records show she was employed with a computer company in 2000, worked as a medical assistant and carpenter in 2010, and was able to work with a saw in 2009." (Tr. 24-25.) Although the hearing transcript does not reflect that Morrow testified that she had not worked since 1998, and the medical records that the ALJ cites are not as explicit as the ALJ implied, the ALJ's general point is still reasonable. On her work history report completed in February 2010, Morrow listed only jobs as a cashier at a grocery store from 1994 to 1995, a file clerk (medical assistant (*see* Tr. 321)) from 1996 to 1997, and a production seamstress making fishing nets. (Tr. 184-86.) Morrow also told Dr. Sayyid in March 2010 that she had not worked since 1998. (Tr. 321.) Yet, the medical records cited by the ALJ provide that in 2000 Morrow reported being employed with a computer company (Tr. 229) and in 2009 Morrow saw Dr. Beck because she

had dropped a saw on her foot (Tr. 286). The ALJ did not unreasonably infer that Morrow's use of the saw in 2009 was work-related: as the ALJ recognized, in June 2010 Dr. Gause noted, "Occupation: Medical assistant and carpenter." (Tr. 330.)

In short, Morrow has not carried her considerable burden of showing that the ALJ's credibility assessment was error. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."); *Boley v. Comm'r of Soc. Sec.*, No. 11-15707, 2012 WL 7748910, at *10-11 (E.D. Mich. Nov. 28, 2012) (Michelson, M.J.) ("Given the generalized nature of Plaintiff's credibility argument, the Court begins by emphasizing a matter of appellate procedure: it is Plaintiff's burden to demonstrate that the ALJ erred."), *report and recommendation adopted by* 2013 WL 1090531 (E.D. Mich. Mar. 15, 2013) (Murphy, J.).

Morrow also claims that the ALJ improperly "delegate[d]" his step-four fact-finding responsibility to the vocational expert who testified at the administrative hearing. (Pl.'s Mot. at 7.) Morrow says that the ALJ was required to make specific findings of fact as to her residual functional capacity assessment, the physical demands of her past job, and whether her residual functional capacity would allow her to meet those demands. (Pl.'s Mot. at 8 (citing S.S.R. 86-62p, 1982 WL 31386).)

The Court finds that the ALJ did not improperly delegate fact-finding at step four to the vocational expert and that the ALJ made the requisite factual findings. In particular, the ALJ adequately explained why he believed Morrow was capable of the full range of light work after detailing the record evidence in his narrative. At the administrative hearing, the ALJ solicited vocational expert testimony as to the exertional level of Morrow's past work as a cashier and file clerk. (Tr. 46.) The vocational expert testified that both positions were "light, semi-skilled." (*Id.*)

With his residual functional capacity assessment and the vocational expert's testimony in hand, the ALJ was in position to conclude at step four that Morrow could perform her past relevant work as a file clerk. (Tr. 25.) The Court finds nothing improper about this mode of analysis.

Morrow, citing *Dodds v. Comm'r of Soc. Sec.*, No. 01-CV-72190-DT, 2002 WL 1880754 (E.D. Mich. June 30, 2002), implies that the ALJ erred in soliciting any vocational expert testimony at step four. Apparently, it is Morrow's position that the ALJ should have accepted her description of her work as a file clerk rather than rely on the vocational expert's classification of the job as light work. The problem with this argument is that Morrow did not provide a description of her file-clerk job at the hearing. And nothing suggests that the vocational expert's assessment of the file-clerk position was not based on Morrow's description of the job in her disability application. In any event, as the Commissioner points out, it is sufficient at step four that the ALJ found that Morrow was capable of working as a file clerk as that job is generally performed in the national economy—the ALJ did not need to find that Morrow was capable of performing her job as she specifically performed it in the past. *See Kenny v. Comm'r of Soc. Sec.*, No. 12-10182, 2013 WL 507730, at *4 (E.D. Mich. Jan. 15, 2013) (Michelson, M.J.), *report and recommendation adopted by* 2013 WL 507918 (E.D. Mich. Feb. 12, 2013) (Rosen, J.).

### III. CONCLUSION AND ORDER

The Court has reviewed the administrative record, the ALJ's decision, and the parties' briefs. Under the governing deferential standard of review, the Court finds that Morrow has not shown that the ALJ's credibility assessment was error or that he improperly used vocational expert testimony at step four. Accordingly, the Court DENIES Plaintiff's Motion for Summary Judgment (Dkt. 8), GRANTS Defendant's Motion for Summary Judgment (Dkt. 11), and AFFIRMS the Commissioner's disability determination pursuant to 42 U.S.C. § 405(g).

SO ORDERED.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: May 13, 2014



CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 13, 2014.

s/Jane Johnson
Deputy Clerk